IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LYNN A. BECKLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. |
| CLEVELAND HARDWARE AND FORGING COMPANY and CARRIE LARSEN, | ) ) ) |
| Defendants. | ) JURY DEMANDED ) |

## COMPLAINT

Plaintiff, LYNN A. BECKLEY, by and through her attorneys, THE COFFEY LAW OFFICE, P.C., states as and for her Complaint against Defendants CLEVELAND HARDWARE AND FORGING COMPANY and CARRIE LARSEN, as follows:

### Nature of Case

1. Plaintiff brings this action against Defendants to recover damages proximately caused by Defendants' illegal denial and interference with her rights and retaliation including constructive termination of her employment, all in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA).

### Jurisdiction and Venue

2. This Court has original jurisdiction over Plaintiff's FMLA claims under 28 U.S.C. §§ 1331, 1337, and 1343, 29 U.S.C. § 216(b).

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367(a).

4. Venue is proper in this Court in that Defendants' illegal acts complained of herein took place within the geographical boundaries of this Court's jurisdiction.

## The Parties

5. Plaintiff, LYNN A. BECKLEY (hereafter "Lynn"), is an individual presently residing in Batavia, Illinois.

6. Defendant, CLEVELAND HARDWARE AND FORGING COMPANY (hereafter "CHFC"), is a foreign corporation that conducts a significant business throughout the geographical boundaries of this Court, including a forging facility in Aurora, Illinois, known as Fox Valley Forge (hereafter "FVF"), where Plaintiff was employed and worked for CHFC and where its illegal activities described below took place.

7. At all relevant times, CHFC employed in excess of 50 employees and was thus an employer and covered entity as defined under the FMLA.

8. Defendant CARRIE LARSEN is an individual who at all times relevant to this Complaint was employed by CHFC and/or one of its wholly-owned subsidiaries in the position of Chief Financial Officer.

9. At all relevant times, Defendant Larsen had supervisory authority over Lynn's employment, acted directly or indirectly in the interest of CHFC with respect to Lynn and the FMLA violations set forth below, and was responsible in whole or in part for the FMLA violations set forth below. Defendant Larsen was therefore an "employer" as defined under the FMLA. See 29 U.S.C. § 2611(4)(A)(i),(ii).

## Relevant Facts

10. Lynn started her employment with CHFC in September 2013 in the position of staff accountant at FVF.

11. In December 2015, CHFC promoted Lynn to the position of Division Accountant at FVF.

12. In Oct 2019, Lynn had four direct reports, three full-time and one part-time, in her position as Divisional Accountant.

13. In the twelve months prior to November 2019, Lynn worked for CHFC well in excess of 1,250 hours.

14. In late Nov 2019, Lynn gave notice to Defendants that she needed leave from work to care for her husband Jeff who had been diagnosed with stage 4 colon cancer.

15. She advised Defendants that Jeff would be undergoing intensive medical treatment including weekly appointment for chemotherapy and monitoring, and that she needed to drive him to, and attend all medical appointments with him as well as provide care for him.

16. Defendants did not notify Lynn of her eligibility to take FMLA leave, did not advise her of any specific expectations and obligations she would have or explain any consequences of a failure to meet these obligations.

17. Defendants also did not notify Lynn that any leave she took to care for Jeff may be designated and counted against her annual FMLA leave entitlement, the applicable 12-month period for FMLA entitlement, or any requirements for her to furnish an FMLA certification or the consequences of failing to do so.

18. From December 9, 2019 to February 20, 2020, Lynn took leave from work to attend at least 18 medical appointments with Jeff that were either chemotherapy treatments, disconnects, or follow up visits. On average, she was out of the office

attending to and caring for Jeff approximately six hours per week during this time period.

19. While Lynn was out of work on medical leave taking care of Jeff, Defendant Larsen and other CHFC employees bombarded her with texts, e-mails, calls and voice messages asking where she was at, whether and when she would be back to the office, to call them from the medical appointments, etc.

20. During this period, Defendants did not reduce or lessen Lynn's performance goals or expectations, or her expected work hours or schedule.

21. Defendant Larsen in fact made it very clear to Lynn that her workload and Defendants' expectations related thereto had not and would not change.

22. In the twelve months prior to February 2020, Lynn worked for CHFC well in excess of 1,250 hours.

23. On February 18, 2020, Lynn took it upon herself to submit to Defendants a FMLA certification that had been completed and signed by Jeff's physician.

24. Lynn's FMLA certification stated that she needed intermittent leave from work to care for Jeff through at least November 2020. It also described Jeff's care needs in detail as well as his plan of treatment including continued chemotherapy treatments for 5-6 weeks, followed by two major surgeries, then recovery and additional chemotherapy and oncology follow-up.

25. While Defendant CHFC this time notified Lynn that her request for intermittent FMLA leave was approved, Defendants again failed to advise her of any specific expectations and obligations she would have or explain any consequences of a failure to meet any such obligations.

26. Defendants also again failed to notify Lynn that any leave she took to care for Jeff may be designated and counted against her annual FMLA leave entitlement, or the applicable 12-month period (i.e., calendar or rolling) for FMLA entitlement.

27. Last, Defendants did not advise Lynn at this time (or ever) of the number of hours of FMLA eligible leave that she had remaining.

28. In April 2020, Defendant Larsen directed that Lynn furlough all members of her staff.

29. At the same time, Defendant Larsen and other CHFC employees began sending a stream of demands to Lynn for her to complete special projects and work in addition to her normal job duties which had been supplemented by the furloughs of her staff.

30. Such demands included, but were not limited to:

 - expedite month-end closing from 4 business days to 2;

 - analyze cash more closely;

 - attend AR collections meetings;

 - a special project related to FVF vendors and related training;

 - adjust insurance deductions for furloughed employees;

 - change over to a new payroll company;

 - Daily Accountability Reports;

 - ERP conferences calls (Lynn declined invites; Defendant Larsen texted and called numerous times during supposed FMLA leave time, demanding that Lynn participate)

 - change banks from Wells Fargo to Johnson Financial Group, and related letters to be sent out to all customers;

 - year-end physical inventory with only two helpers whereas in past years there were as many as six;

- meeting request for NetSuite while at doctor appointment with Jeff;

- supposed transfer accounts payable function to CHFC's Green Bay, WI office;

- continuous meeting requests re: new ERP and payroll systems as well as other topics; and,

- process PPP loan expense payment backup.

31. In the twelve months prior to July 2020, Lynn worked for CHFC well in excess of 1,250 hours.

32. In July and August 2020, Lynn notified Defendants that Jeff's first surgery had been scheduled for August 24, 2020, would require her to be with him in hospital for four days, and that she may be needed for much more care time once back at home depending on how the surgery went.

33. After Jeff's surgery, Lynn notified Defendants that she was needed at home to care for Jeff around the clock for the following two weeks.

34. Once again, Defendants failed to notify Lynn (1) of her eligibility to take continuous FMLA leave, (2) any specific expectations and/or obligations they had on her job performance or related to her leave form work, (3) explain any consequences of a failure to meet these obligations, (4) that any leave she took to care for Jeff may be designated and counted against her annual FMLA leave entitlement, (5) the applicable 12-month period for FMLA entitlement, (6) any requirements for her to furnish an FMLA certification and the consequences of failing to do so, or (7) the number of hours of FMLA eligible leave that she had remaining.

35. Defendants also then demanded that Lynn leave Jeff and conduct year-end physical inventory as well as month-end and year- end closings.

36. The week following Jeff's surgery, Lynn was forced to work in excess of 70 hours.

37. At the end of October 2020, Jeff re-started chemotherapy treatments.

38. From late February through the end of the year 2020, while Lynn was out of work on supposed leave caring for Jeff, Defendants continued to bombard her with texts, e-mails, calls and voice messages asking where she was at, whether/when she would be back to work after the appointments, to call them from the medical appointments, etc.

39. Defendants did not reduce or lessen Lynn's performance goals or expectations, or her expected work hours or schedule.

40. Defendant Larsen in fact again made it very clear that Lynn's workload and Defendants' expectations had increased as noted above.

41. In the twelve months prior to November 2020, Lynn worked for CHFC well in excess of 1,250 hours.

42. In early November 2020, Lynn again notified Defendants of her need for leave from work to care for Jeff and requested an update of her FMLA status as Jeff's treatment was entering the final stage and planned to go through at least April 2021.

43. Defendants did not reply.

44. From February 16, 2020 through to Defendant's January 2021 constructive discharge, Lynn worked an average of 50 hours per week.

45. The above-described interference, denial and retaliation by Defendants in contravention to Lynn's FMLA rights and their FLMA duties as well as other discriminatory and/or retaliatory acts and/or omissions taken by Defendants against her, coupled with CHFC's failure to reply to her notice of the need to take additional leave in the coming

months or provide her with any indication that they were prepared to comply with their FMLA duties to allow her to take the additional leave free form interference and/or retaliation rendered Lynn's working conditions so intolerable that a reasonable person would have been compelled to resign and did in fact cause Lynn to leave her CHFC employment in January 2021.

### Count I: Interference with, Restraint and Denial of Rights in Violation of the FMLA
### (v. All Defendants)

46. Lynn restates and fully incorporates into Count I the allegations of Paragraphs 1 through 45, above.

47. The FMLA was enacted because Congress found, among other things, that "it is important for the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members who have serious health conditions" and that "the lack of employment policies to accommodate working parents can force individuals to choose between job security and parenting." 29 U.S.C. §§ 2601(a)(2)-(3).

48. The FMLA was intended to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)-(2). The FMLA seeks to accomplish these purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

49. The FMLA provides that "an eligible employee shall be entitled to take a total of 12 workweeks of leave within a 12-month period" to care for a spouse with a serious health condition renders them unable to perform their job function. 29 U.S.C. § 2612(a)(1)(D).

50. "Eligible employee" is defined in the statute as "an employee who has been employed . . . for at least 12 months by the employer" and who has "at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

51. The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. §2615(a)(1).

52. The FMLA regulations require that covered employers such as Defendants notify employees who request leave of their eligibility for FMLA leave within five business days. See 29 C.F.R. 29 CFR § 825.300(b).

53. This notice must detail the employer's specific expectations and obligations of the employee and explain any consequences of a failure to meet these obligations. 29 C.F.R. 29 CFR § 825.300(c).

54. This notice must also include among other things that the leave may be designated and counted against the employee's annual FMLA leave entitlement if qualifying (see §§ 825.300(c) and 825.301) and the applicable 12-month period for FMLA entitlement (see §§ 825.127(c), 825.200(b), (f), and (g)), must notify the employee of the amount of leave counted against the employee's FMLA leave entitlement, including, if known, the number of hours, days, or weeks that will be counted against the employee's FMLA leave entitlement (see §§ 825.300(d)(4), (d)(6)); as well as any requirements for the employee to furnish certification of a serious health condition, serious injury or illness, or qualifying exigency arising out of covered active duty or call to covered active duty status, and the consequences of failing to do so (see §§ 825.305, 825.309, 825.310,

825.313). 29 C.F.R. 29 CFR § 825.300(c)

55. In November 2019 and thereafter through to Defendants' January 2021 constructive termination of her employment, Lynn was an "eligible employee" as defined under the FMLA.

56. As described above, in November 2019, April 2020, July and August 2020, and again in November 2020, Lynn notified Defendants of her need for leave from work to care for her husband, Jeff.

57. As described above, from November 2019 through to Defendants' January 2021 constructive termination of Lynn's employment, Jeff suffered from a serious health condition as that term is defined under the FMLA.

58. As described above, from November 2019 and thereafter through to Defendants' January 2021 constructive termination of her employment, Defendants interfered with, restrained and effectively denied Lynn's exercise and attempts to exercise her FMLA rights including leave from work to care for her husband and in fact forced her to work more hours than normal all during her and her husband's time of great need.

59. As described above, Defendants failed to provide Lynn with numerous notices required by the FMLA and/or its regulations including but not limited to: notice of her FMLA eligibility detailing their specific expectations and obligations of the employee and explain any consequences of a failure to meet these obligations, notice of that leave may be designated and counted against her annual FMLA leave entitlement if qualifying, notice of the applicable 12-month period for FMLA entitlement, notice of any requirements for her to furnish certification of a serious health condition and the consequences of failing to do so, and notice of amount of leave used or remaining.

60. Last, as described above, Defendants continually failed to adjust Lynn's job duties or their performance requirements/expectations to take into account any FMLA covered time away from work.

61. As a direct and proximate result of Defendants' illegal interference, restraint and denials as described above, Lynn suffered mental and related physical pain and anguish, loss of enjoyment of life, a loss of wages, including, but not limited to, salary, bonuses, a loss of employment benefits and other pecuniary and non-pecuniary damages, and she is expected to incur future damages.

62. Defendants knew that their interference, restraint and denials as described above were prohibited by the FMLA, or acted with a reckless disregard tfo that possibility.

### Count II: Retaliation in Violation of the FMLA
### (v. All Defendants)

63. Lynn restates and fully incorporates into Count II the allegations of Paragraphs 1 through 45, above.

64. The FMLA also prohibits employers from discriminating or retaliating against an employee for exercising or attempting to exercise his or her FMLA rights. 29 U.S.C. § 2615(a)(2).

65. As described above, Lynn's November 2019, April 2020, July and August 2020, and November 2020 requests for FMLA leave were individually and in the aggregate activity protected by the FMLA.

66. Defendants took the above-described adverse actions against Lynn, including violating her FMLA rights, violating their FMLA duties, continually failing to adjust her job duties or their performance requirements/expectation to take into account any FMLA covered time away from work, and constructively terminating her employment

11

in retaliation for her protected activities in violation of the FMLA.

67. As a direct and proximate result of Defendants' illegal retaliation as described above, Lynn suffered mental and related physical pain and anguish, loss of enjoyment of life, a loss of wages, including, but not limited to, salary, bonuses, a loss of employment benefits and other pecuniary and non-pecuniary damages, and she is expected to incur future damages.

68. Defendants knew that their retaliatory acts and omissions as described above were prohibited by the FMLA, or acted with reckless disregard to that possibility.

### **<u>Count III: Retaliatory Constructive Termination of Employment<br>in Violation of the Common Law of Illinois<br>(v. Defendant CHFC)</u>**

69. Lynn restates and fully incorporates into Count III the allegations of Paragraphs 1 through 45, above.

70. As expressed in the Illinois Health Insurance Claim Filing Act ("IHICFA") (820 ILCS § 45/0.01 *et seq.*), it is the clearly mandated public policy of Illinois "to encourage employers to obtain group health insurance coverage or otherwise provide for or furnish medical or health care services for their employees and to encourage employees to exercise their rights and privileges under such policies or contracts of insurance or other plans or arrangements for providing for payment of or furnishing medical or health care services."

71. Under the IHICFA, "[n]o employer who makes available to employees group health insurance coverage or otherwise provides for payment of or furnishes medical or health care services under a group health insurance policy or contract, . . . shall discharge an employee where the basis for such discharge is retaliation for the filing of a legitimate claim or the actual use or receipt of medical or health care services by an employee under

such insurance policy or contract, or any other health care plan or arrangement, whether insurance or not. See 820 ILCS § 45/2.

72. During Lynn's CHFC employment, she and her spouse Jeff participated in CHFC's group health care plan.

73. During 2020 alone, the costs of legitimate medical care and services related to Jeff's illness as described above and filed/claimed pursuant to CHFC's group health insurance plan exceeded $890,000.

74. Lynn's filing/claiming such costs with and pursuant to CHFC's group health insurance plan was activity protected by the IHICFA and clearly mandated public policy as embodied in the IHICFA.

75. CHFC took the above-described adverse actions against Lynn, including violating her FMLA rights, violating its FMLA duties, continually failing to adjust her job duties or their performance requirements/expectation to take into account any FMLA covered time away from work, and constructively terminating her employment in retaliation for her protected activities in violation of the IHICFA and Illinois common law.

76. As a direct and proximate result of CHFC' illegal retaliation as described above, Lynn suffered mental and related physical pain and anguish, loss of enjoyment of life, a loss of wages, including, but not limited to, salary, bonuses, a loss of employment benefits and other pecuniary and non-pecuniary damages, and she is expected to incur future damages.

77. CHFC knew that their retaliatory acts and omissions as described above were prohibited by the IHICFA and Illinois common law, or acted with reckless disregard to that possibility.

78. The above-described conduct by CHFC was willful and wanton, and with reckless disregard and indifference to the IHICFA and Illinois common law, and to Lynn's rights thereunder. CHFC should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

### Count IV: Intentional Infliction of Emotional Distress in Violation of the Common Law of Illinois
### (v. Defendant Carrie Larsen)

79. Lynn restates and fully incorporates into Count IV the allegations of Paragraphs 1 through 45, above.

80. Defendant Larsen's intentional course of misconduct against Lynn and her family as described above was extreme and outrageous and inflicted severe emotional distress and mental and physical pain on her and them.

81. Defendant Larsen intended that her misconduct inflict severe emotional distress, and knew that there was at least a high probability that such conduct would cause severe emotional distress.

82. As a direct and proximate result of Defendant Larsen's illegal actions as described above, Lynn has suffered and continues to suffer severe emotional and related physical pain and anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary damages.

83. Defendant Larsen knew that her misconduct as described above was illegal, and acted with willful and wanton disregard to the law and Lynn's rights thereunder. Defendant Larsen should therefore be subject to punitive damages as an example to deter others from engaging in conduct of this kind.

### Count V: Respondeat Superior Liability v. Defendant CHFC
### (as to Count IV)

84. Michael restates and fully incorporates into Count V his allegations set forth in Paragraphs 1 through 45, above.

85. In Illinois, under the theory of Respondeat Superior, an employer such as CHFC can be liable for the illegal conduct of an employee committed within the scope of employment. Respondeat Superior liability extends to the negligent, willful, malicious or even criminal acts of its employees, when those acts are committed with the scope of employment.

86. Defendant Larsen's illegal acts complained of herein were committed while she was working for CHFC in her position as CFO and within the scope of her CFO duties and employment with and by CHFC.

87. CHFC is therefore liable to Michael for the illegal torts of its CFO Defendant Larsen under Respondeat Superior.

### Prayer for Relief (as to all Counts)

**WHEREFORE**, Plaintiff, LYNN A. BECKLEY, respectfully requests that this Court enter judgment in her favor and against Defendants jointly and severally as follows:

A. Order Defendants to make LYNN whole by paying her appropriate back pay and reimbursement for lost pension, social security and other benefits and out-of-pocket expenses, plus pre-judgment interest in an amount to be shown at trial;

B. Order Defendants to immediately reinstate LYNN to her former position or one comparable thereto; or, in the alternative, order Defendants to pay LYNN an appropriate amount of front pay;

C. [Counts I and II, only] Order Defendants to pay LYNN an additional amount as liquidated damages equal to the sum of the amount described in Par. A, above.

D. Order Defendants to pay LYNN compensatory damages in the maximum amount allowable under the law;

  E. [Counts III and IV, only] Order Defendants to pay LYNN punitive damages in the maximum amount allowable under the law.

  F. Order Defendants to pay LYNN's costs incurred in bringing this action, including, but not limited to, expert witness fees and reasonable attorneys' fees;

  G. Try all issues of fact to a jury; and,

  H. Grant such other relief as the Court deems just.

        Respectfully submitted,
        Plaintiff, LYNN A. BECKLEY,


        <u>By: /s/ Timothy J. Coffey</u>
        Timothy J. Coffey (ARDC # 6224686)
        THE COFFEY LAW OFFICE, P.C.
        Attorneys for LYNN A. BECKLEY
        118 N. Clinton Street, Ste. 125
        Chicago, IL 60661
        (312) 627-9700
        (630) 326-6601 (fax)
        tcoffey@worker-law.com